**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **COBALT INTERNATIONAL ENERGY, INC.**, *et al.*,[1] | ) | Case No. 17-36709 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**TO THE FOURTH AMENDED JOINT CHAPTER 11 PLAN OF COBALT**
**INTERNATIONAL ENERGY, INC., AND ITS DEBTOR AFFILIATES**

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Cobalt International Energy, Inc.  (1169); Cobalt International Energy GP, LLC (7374); Cobalt International Energy, L.P. (2411); Cobalt GOM LLC (7188); Cobalt GOM # 1 LLC (7262); and Cobalt GOM # 2 LLC (7316). The Debtors' service address is: 920 Memorial City Way, Suite 100, Houston, Texas 77024.

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ..................................................................................1

II.   BACKGROUND .......................................................................................................2

    A.    General ...........................................................................................................2

    B.    Sale Transaction.............................................................................................2

    C.    Challenge Deadline and Standing Motion ...................................................2

    D.    Disclosure Statement and Plan.......................................................................3

           1.    Plan Releases ....................................................................................4

           2.    Intercompany Claims ......................................................................7

           3.    Confirmation Discovery...................................................................8

III.  OBJECTION.............................................................................................................9

    A.    The Plan Releases Are Impermissible ........................................................9

           1.    The Debtor Releases Are Improper .........................................................10

           2.    The Court May Not Have Subject Matter Jurisdiction to Grant the Third Party Releases ........................................................................11

           3.    Even if the Court Has Jurisdiction to Grant the Third Party Releases, Such Releases Are Improper In This Case ................................12

           4.    Claims Subject to the Pending Standing Motion Should not be Released ......................................................................................17

    B.    The Plan Fails the Best Interests of Creditors Test.................................18

    C.    The Plan Does Not Properly Retain Causes of Action ..........................19

    D.    The Plan Is Not Proposed in Good Faith ...............................................22

    E.    The Debtors May not Be Able to Satisfy 1129(a) or (b) of the Bankruptcy Code ........................................................................................22

    F.    The Plan and Confirmation Order Must Preserve the Right of the Committee and/or Plan Administrator to Object to Intercompany Claims............24

G.      Joinder to _____ ...........................................................................................25

IV.     RESERVATION OF RIGHTS ........................................................................................25

V.      CONCLUSION..............................................................................................................25

DOCS_NY:37487.4 15117/002

## TABLE OF AUTHORITIES

**Pages**

**Cases**

*Ad Hoc Group of Vitro Noteholders v. Vitro, S.A.B. de C.V. (In re Vitro SAB de CV)*,
    701 F.3d 1031 (5th Cir. 2012) ........................................... 12

*Applewood Chair Co. v. Three Rivers 150 Planning & Dev. Dist. (In re Applewood)*,
    203 F.3d 914 (5th Cir. 2000) ........................................... 17

*Bank of N.Y. Trust Co. v. Official Unsecured Creditor's Comm. (In re Pac. Lumber Co.)*,
    584 F.3d 229 (5th Cir. 2009) ........................................... 12

*Compton v. Anderson (In re MPF Holdings U.S. LLC)*,
    701 F. 3d 449 (5th Cir. 2012) ........................................... 20

*Dynasty Oil & Gas, LLC v. Citizens Bank (In re United Operating, LLC)*,
    540 F. 3d 351 (5th Cir. 2008) ........................................... 20

*Feld v. Zale Corp. (In re Zale Corp.)*,
    62 F.3d 746 (5th Cir. 1995) ........................................... 12

*Hernandez v. Larry Miller Roofing, Inc.*,
    2016 U.S. App. LEXIS 204 (5th Cir. Jan. 5, 2016) ........................................... 16

*In re ADPT DFN Holdings, LLC*,
    574 B.R. 87 (N.D. Tex. 2017) ........................................... 25

*In re Affiliated Foods, Inc.*,
    249 B.R. 770 (Bankr. W.D. Mo. 2000) ........................................... 19

*In re Bigler LP*,
    442 B.R. 537 (Bankr. S.D. Tex. 2010) ........................................... 9, 10

*In re New Towne Dev., LLC*,
    410 B.R. 225 (Bankr. M.D. La. 2009) ........................................... 13, 17

*In re Patriot Place, Ltd.*,
    486 B.R. 773 (Bankr. W.D. Tex. 2013) ........................................... 12, 13

*In re SunEdison, Inc.*, 576 B.R. 453 (Bankr. S.D.N.Y. 2017) ........................................... 11

*In re Texas Extrusion Corp.*,
    844 F.2d 1142 (5th Cir.), *cert. denied*, 488 U.S. 926 (1988) ........................................... 23

*In re Tribune Co.*,
    464 B.R. 126 (Bankr. D. Del. 2011) ........................................... 25

iii

*In re Wash. Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) ........................................................................ 19

*In re Wool Growers Cent. Storage Co.*,
    371 B.R. 768 (Bankr. N.D. tex. 2007), *aff'd*, 255 F. App'x. 909 (5th Cir. 2007) ........... 13

*Jasik v. Conrad (In re Jasik)*,
    727 F.2d 1379 (5th Cir. 1984) ............................................................................... 23

*Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*,
    517 F.3d 52 (2d Cir. 2008), *vacated & remanded on other grounds*, 557 U.S. 137
    (2009), *aff'g in part & rev'g in part*, 600 F.3d 135 (2d Cir.), *cert. denied*, 562 U.S.
    1082 (2010)) ...................................................................................................... 11

*JPMCC 2007-C1 Grasslawn Lodging, LLC v. Transwest Resort Props. (In re Transwest
    Resort Props.)*,
    881 F.3d 724 (9th Cir. 2018) ................................................................................ 25

*Republic Supply Co. v. Shoaf*,
    815 F.2d 1046 (5th Cir. 1987) ............................................................................... 14

*Rossco Holdings, Inc. v. McConnell*,
    613 Fed. Appx. 302 (5th Cir. 2015) ....................................................................... 20

*United States v. Prescription Home Health Care, Inc. (In re Prescription Home Health
    Care, Inc.)*,
    316 F.3d 542 (5th Cir. 2002) ................................................................................ 11

*Wooley v. Haynes & Boone, L.L.P. (In re SI Restructuring Inc.)*,
    714 F. 3d 860 (5th Cir. 2013) ............................................................................... 20

**Statutes**

11 U.S.C. §1123(b)(3)(A) .......................................................................................... 9, 10

11 U.S.C. §1129(a)(7) ................................................................................................ 17

11 U.S.C. §1141(d) ................................................................................................. 8, 12

11 U.S.C. §1141(d)(3) ............................................................................................. 8, 12

11 U.S.C. §524(e) ..................................................................................................... 12

28 U.S.C. §1334(b) ................................................................................................... 11

**Other Authorities**

7 Collier on Bankruptcy ¶ 1129.03[7][b] (15th rev. ed. 2009) ........................................... 17

DOCS_NY:37487.4 15117/002

The Official Committee of Unsecured Creditors (the "Committee") of Cobalt International Energy, Inc. *et al.* (the "Debtors") hereby objects (the "Objection") to the *Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc., and its Debtor Affiliates* [Docket No. 561] (the "Plan").  In support of the Objection, the Committee respectfully states as follows:

<h1 style="text-align:center">I.   PRELIMINARY STATEMENT</h1>

1.    The Committee hereby objects to confirmation of the Plan on multiple grounds, including that the Plan (i) contains improper, gratuitous direct and third party releases to, among others, the past and present officers and directors of the Debtors for no consideration in the face of meritorious claims against them asserted in pending litigation, (ii) releases colorable and meritorious claims against the First and Second Lien Lenders for no consideration, including the claims to avoid fraudulent transfers and to materially reduce the claims of the First and Second Lien Lenders based on the improper inclusion of original issue discount and make whole premiums that are subject to disallowance, (iii) fails the best interests test, and (iv) depending upon the outcome of the plan voting, may not be confirmed under the cramdown provisions.  Moreover, there is a continuing inquiry by the Ad Hoc Committee of Unsecured Noteholders into potential collusion by the joint bidders who submitted the winning bid at the auction for the Debtors' most valuable asset which, if proven to have resulted in the very disappointing outcome of the auction, constitutes an additional basis for denial of confirmation of the Plan.

## II.  BACKGROUND

**B.**      **General**

2.      On December 14, 2017 (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these cases.

3.      On December 21, 2017, the Office of the United States Trustee appointed the Committee pursuant to section 1102 of the Bankruptcy Code.  The Committee consists of the following three members: (a) Wells Fargo Bank, National Association; (b) Baker Hughes, a GE Company; and (c) Schlumberger Technology Corporation.

**C.**      **Sale Transaction**

4.      On March 6, 2018, the auction with respect to the sale of the Debtors' assets was conducted and concluded.  *See Notice of Successful Bidders and Backup Bidders* [Docket No. 542].  Approval of the sale of such assets to the successful bidders will be considered in connection with confirmation of the Plan.

**D.**      **Challenge Deadline and Standing Motion**

5.      On January 25, 2018, the Court entered a final order authorizing the Debtors' use of cash collateral (and approving the terms and conditions of such use negotiated among the Debtors and other parties in interest) [Docket No. 301] (the "Cash Collateral Order").

6.      Paragraph D of the Cash Collateral Order sets forth certain stipulations between the Debtors and the Secured Parties concerning, among other things, the validity of the liens and security interests granted under the Security Agreements (collectively, the "Stipulations").  *See* Cash Collateral Order at ¶ D.

2

7.     Pursuant to the terms and conditions of the Cash Collateral Order, these Stipulations represent a compromise between the Debtors and the Secured Parties that remains subject to approval by further order of the Court.

8.     Pursuant to the *Order Continuing the Hearing to Approve the Stipulations and Compromise Set Forth in the Cash Collateral Order* [Docket No. 597], a hearing to approve the Stipulations is scheduled for April 3, 2018, and the Stipulations will become binding upon the Debtors and their affiliates unless a party in interest with proper standing files an adversary proceeding objecting to the Stipulations by March 27, 2018 (the "Challenge Deadline").

9.     On March 27, 2018, the Committee filed the *Motion for Entry of an Order Granting Standing to the Official Committee of Unsecured Creditors of Cobalt International Energy Inc., et al. to Prosecute Estate Causes of Action to Avoid and Recover Fraudulent Transfers and Disallow Claims of Holders of First Lien Notes and Second Lien Notes* [Docket No. 651] (the "Standing Motion").[2]  Pursuant to the terms of the Cash Collateral Order, the filing of the Standing Motion tolls the Challenge Deadline.

**E.     Disclosure Statement and Plan**

10.     On March 8, 2018, the Debtors filed the Plan and *Disclosure Statement for the Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* [Docket No. 562] (the "Disclosure Statement").

11.     On March 8, 2018, the Court entered the *Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with*

---

[2] To avoid unnecessary duplication of pleadings, the facts and arguments contained in the Standing Motion are incorporated herein by reference.

*Respect Thereto, and (V) Granting Related Relief* [Docket No. 563] (the "Disclosure Statement Order").

12.    On March 21, 2018, the Debtors filed the *Notice of Filing of Plan Supplement* [Docket No. 612].

**1.    Plan Releases**

13.    The Plan proposes to provide broad, gratuitous direct releases from the Debtors (the "Debtor Release") and non-debtors (the "Third Party Release" and, together with the Debtor Release, the "Releases") running to a lengthy list of released parties (each, a "Released Party"), including past and present officers and directors of the Debtors and Secured Parties. Pursuant to the Debtor Release set forth in Article VIII.B. of the Plan, the Debtors and their Estates will release each "Released Party" from

> any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Plan, Article VIII.B.

14.    "Released Party" means:

(a) the First Lien Noteholders;

(b) the First Lien Ad Hoc Group;

(c) the Second Lien Noteholders;

(d) the Second Lien Ad Hoc Group;

(e) the Unsecured Noteholders;

(f) the Unsecured Notes Ad Hoc Committee;

(g) the First Lien Indenture Trustee;

(h) the Second Lien Indenture Trustee;

(i) the 2.625% Senior Notes Indenture Trustee;

(j) the 3.125% Senior Notes Indenture Trustee;

(k) the Committee and its members; and

(l) with respect to each of the Debtors and each of the foregoing entities in clauses (a) through (k), such Entity and its current and former Affiliates and subsidiaries, and such Entities' and their current and former Affiliates' and subsidiaries' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; provided that any holder of a Claim or Interest that opts out or otherwise objects to the releases in the Plan shall not be a "Released Party."

Plan, Article I.105.

15.     Pursuant to the Third Party Release set forth in Article VIII.C. of the Plan,

each "Releasing Party" will release each "Released Party" from

any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors'

5

in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Plan, Article VIII.C.

16.     "Releasing Party" means:

(a) the First Lien Noteholders;

(b) the First Lien Ad Hoc Group;

(c) the Second Lien Noteholders;

(d) the Second Lien Ad Hoc Group;

(e) the Unsecured Noteholders;

(f) the Unsecured Notes Ad Hoc Committee;

(g) the First Lien Indenture Trustee;

(h) the Second Lien Indenture Trustee;

(i) the 2.625% Senior Notes Indenture Trustee;

(j) the 3.125% Senior Notes Indenture Trustee;

(k) the Committee and its members;

(l) all holders of Claims,

(m) all holders of Interests, and

(n) with respect to each of the Debtors and each of the foregoing entities in clauses (a) through (m), such Entity and its current and

former Affiliates and subsidiaries, and such Entities' and their current and former Affiliates' subsidiaries' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; provided that any holder of a Claim or Interest that opts out or otherwise objects to the releases in the Plan shall not be a "Releasing Party."

Plan, Article I.106.

17.     In addition, the Plan provides that the Debtors, on behalf of themselves

and the estates, shall release all Avoidance Actions.  *See* Plan at Article IV.M.

### 2.     Intercompany Claims

18.     Pursuant to Article III.B of the Plan, all Allowed Intercompany Claims,

"shall be treated *pari passu* with General Unsecured Claims against the applicable Debtor and

will share in distributions from such Debtor.  In lieu of Cash payment to the Debtors holding

such Intercompany Claims, the distributions on account of such Intercompany Claims may be

made to the creditors of the Debtor holding such Intercompany Claims."  Plan, at Article

III.B.8(b).

19.     The Disclosure Statement provides a range of recovery of 0.8% - 60.4%

for holders of Subsidiary General Unsecured Claims in Class 5. *See* Disclosure Statement at 7.

The lower range "assumes certain intercompany claims are Allowed pursuant to the Plan,"

among other things.  *See id.*

20.     Contemporaneously herewith, the Committee is filing the *Objection of*

*Official Committee of Unsecured Creditors to Intercompany Payable* (the "Committee

Intercompany Payable Objection") seeking disallowance of or, in the alternative,

recharacterization of, the $6,016,200,406.57 payable asserted as owed by Cobalt Energy, L.P. to

Cobalt International Energy, Inc. on Cobalt International Energy, L.P.'s Schedule F.  Such

payable is listed thereon as contingent, unliquidated and disputed.  Pursuant to the approved bar

date procedures, Cobalt International Energy, Inc. is not required to file proofs of claim on

account of claims owed by other Debtors, like Cobalt International Energy, L.P.

**3.**     **Confirmation Discovery**

21.     On March 14, 2018, the Committee served upon the Debtors its discovery

requests in connection with confirmation of the Plan.  *See Official Committee of Unsecured*

*Creditors of Cobalt International Energy, et al.'s Notice of Service of Discovery on Debtors*

[Docket No. 591].  The Committee and Debtors met and conferred with respect to the Debtors'

production of documents, and the Debtors produced documents to the Committee on March 22,

2018 and thereafter.  On March 27, 2018, the Committee deposed Paul Keglevic, the Debtors'

disinterested director, and David D. Powell, the Debtors' Chief Financial Officer.  On March 28,

2018, the Committee deposed Timothy J. Cutt, the Debtors' Chief Executive Officer.  On March

29, 2018, the Committee deposed William P. Utt, the Chairman of the Board, and John E.

Hagale, a director.  The Committee reserves its right to supplement this Objection as discovery is

ongoing.[3]

---

[3] In addition, the Committee reserves its right to supplement this Objection with respect to whether the Debtors
satisfy the cramdown requirements under section 1129(b) of the Bankruptcy Code in the event that the Debtors
cannot satisfy section 1129(a)(8) of the Bankruptcy Code.  The voting deadline was March 28, 2018 and the voting
report is not due until April 2, 2018, the day before the confirmation hearing.  Accordingly, as of the filing of this
Objection, it is unclear whether the Debtors will be seeking confirmation of the Plan under section 1129(b) of the
Bankruptcy Code.

### III. OBJECTION

**A.      The Plan Releases Are Impermissible**

22.      This Plan is a liquidating plan pursuant to which proceeds from the Sale Transaction will be distributed, the Debtors' remaining assets will be liquidated, and the Debtors will wind down their affairs and ultimately be dissolved.  All of the Debtors' and non-debtors' directors and officers will be terminated on the Effective Date and the Plan Administrator will be appointed as the sole manager and officer of the Debtors and appoint new directors and officers of the non-debtor subsidiaries. The Debtors will not receive a discharge because it is a liquidating plan and the Debtors are not individuals.  *See* 11 U.S.C. §1141(d)(3).  Given that the Debtors will not receive a discharge and will not be reorganizing or continuing to operate after the Effective Date, neither the need for "finality" nor the services of the Debtors' current directors or officers exist here.

23.      If by statute the Debtors are not even receiving a discharge, how could it be appropriate to hand out releases to non-debtors?  *See* 11 U.S.C. §1141(d); *infra* at ¶31.  Even if creditors voted overwhelmingly to accept the Plan and no party objected to confirmation, the Court still has an independent duty to make findings regarding the satisfaction of all confirmation requirements.  As set forth below, the Debtors have not met the Fifth Circuit's stringent requirements for approval of the Debtor Release or Third Party Release.  Accordingly, such Releases must be stricken from the Plan.

24.      The evidence will show, contrary to the Debtors' conclusory statements in the Plan and Disclosure Statement, that: no rationale exists for the Releases; the Releases are not the result of a compromise that reflects the give and take of a true arms-length negotiation process; many of the Released Parties (including, without limitation, the equity sponsors, former directors and officers and certain current directors and officers) have provided no consideration

9

in exchange for the Releases; the Releases are not an integral part of the Plan; and the Releases

are not fair, equitable or in the best interest of the estates or creditors.  To add to insult to injury,

the Debtors seek approval of these gratuitous releases while seeking to retain all claims against

all parties on the Creditor Matrix without adequate notice.  *See infra* at ¶¶46-53.  Based on the

evidence, the Court will be unable to find that the Releases as proposed are permissible.

### 1.   The Debtor Releases Are Improper

25.     Under section 1123(b)(3)(A), a chapter 11 plan may provide for "the

settlement or adjustment of any claim or interest belonging to the debtor or to the estate," if  such

settlement is voluntary, fair and equitable and in the best interests of the estate.  11 U.S.C.

§1123(b)(3)(A).  While section 1123(b)(3)(A) permits a plan to provide for a release of claims

belonging to the estate, including a release of estate claims against non-debtors, any such release

must as a threshold matter satisfy the requirement of a valid settlement of claims under the

Bankruptcy Code.  *See In re Bigler LP*, 442 B.R. 537, 543 (Bankr. S.D. Tex. 2010). Specifically,

"[i]t would require, inter alia, consent and consideration by each participant in the agreement to

be valid."  *Id.* at 543-44.  In *Bigler*, the court approved a release of estate claims against non-

debtors where the release was part of the consideration given to a non-debtor (Amegy Bank),

which was providing all of the funding to effectuate the terms of the plan – including payments

to unsecured creditors.  *See id.* at 544.   Thus, the court concluded, it was a settlement of claims

"for consideration, pursuant to arms-length negotiations" in satisfaction of section

1123(b)(3)(A).  *Id.*

26.     The Debtors propose to release valuable estate claims, including those

asserted in the pending Derivative Actions notwithstanding the fact that settlements with certain

insurers have already generated over $15 million in proceeds with respect to these and the

securities class action claims against officers and directors.  The evidence will show that,

contrary to the Debtors' conclusory statements in the Plan and Disclosure Statement, the Debtor

Release is not fair, equitable or in the best interests of the estates to the extent it releases estate

claims against non-debtor parties because (i) the Debtors' investigation regarding such claims

was flawed and woefully inadequate; (ii) it is not integral to the Plan, (iii) it was not vigorously

negotiated and is not the result of a compromise that reflects the give and take of a true arms-

length negotiation process; and (iv) many of the Released Parties have provided no

consideration.

27.     Furthermore, the Debtor Release is impermissibly broad.  For example, it

does not exclude claims relating to acts or omissions of Released Parties that constitute gross

negligence, fraud, willful misconduct or bad faith.  In addition, it purports to release claims that

the Debtors could assert on behalf of any creditor of any Debtor "or other Entity." Such a

provision could be interpreted as releasing claims on behalf of creditors of the non-debtor

entities, which is impermissible. Further, it purports to release claims relating to "intercompany

transactions."  It is unclear what the universe of "intercompany transactions" is.  At the very

least, it can be interpreted as releasing any right to object to Intercompany Claims, which the

Debtors have scheduled as contingent, unliquidated and disputed.

**2.      The Court May Not Have Subject Matter Jurisdiction to
         Grant the Third Party Releases**

28.     Bankruptcy courts have limited jurisdiction to enjoin a creditor's

unasserted claims against a third party.  Such jurisdiction over a non-debtor's claim against a

non-debtor exists only if such claim is "related to" the bankruptcy.  *See*, *e.g.*, *United States v.

Prescription Home Health Care, Inc. (In re Prescription Home Health Care, Inc.)*, 316 F.3d 542,

547 (5th Cir. 2002); 28 U.S.C. §1334(b).  As one court recently emphasized, even a financial

contribution to the estate by the releasee, without more, does not confer subject matter

jurisdiction to enjoin claims against the releasee.  *See In re SunEdison, Inc.*, 576 B.R. 453, 461

(Bankr. S.D.N.Y. 2017) (citing *Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-*

*Manville Corp.)*, 517 F.3d 52, 66 (2d Cir. 2008), *vacated & remanded on other grounds*, 557

U.S. 137 (2009), *aff'g in part & rev'g in part*, 600 F.3d 135 (2d Cir.), *cert. denied*, 562 U.S. 1082

(2010)).

29.     The Debtors have not established that the claims they seek to release

against non-debtors will have any conceivable impact upon their estates in these liquidating

cases. *See Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 753 (5th Cir. 1995).

30.     For example, the Debtors cannot invoke the Court's jurisdiction to

approve the Third Party Release here by citing to any indemnification obligations owed to

directors and officers because all such indemnification claims are limited to insurance pursuant

to the terms of the Plan.  Thus, they will have no impact upon the estates.  The Debtors have not

and cannot cite to indemnification obligations owed to any other party who is not a director or

officer or, for that matter, any other obligations owed to any party that would have an effect on

the estates.  Thus, the Court does not have jurisdiction to enjoin such claims.

**3.     Even if the Court Has Jurisdiction to Grant the Third
Party Releases, Such Releases Are Improper In This Case**

31.     Even where the Court has jurisdiction, the Fifth Circuit forbids non-

consensual, non-debtor releases.  *See, e.g.*, *In re Patriot Place, Ltd.*, 486 B.R. 773, 822-23

(Bankr. W.D. Tex. 2013) (citing *Ad Hoc Group of Vitro Noteholders v. Vitro, S.A.B. de C.V. (In*

*re Vitro SAB de CV)*, 701 F.3d 1031 (5th Cir. 2012); *Bank of N.Y. Trust Co. v. Official*

*Unsecured Creditor's Comm.* (*In re Pac. Lumber Co.*), 584 F.3d 229, 252 (5th Cir. 2009); *Zale*

*Corp.*, 62 F.3d 746.  Moreover, the Fifth Circuit has expressly declined to follow other circuits

that have taken a more lenient view toward non-debtor releases under certain "extraordinary circumstances." *See Patriot Place*, 486 B.R. at 822-23.

32.     A confirmed plan discharges a debtor that continues in business from any pre-confirmation debt, though the discharge does not affect the liability of any other entity for discharged debt. *See In re New Towne Dev., LLC*, 410 B.R. 225, 230 (Bankr. M.D. La. 2009); 11 U.S.C. §1141(d); 11 U.S.C. §524(e)). However, the Debtors are not entitled to a discharge under the proposed Plan because it provides for liquidating substantially all the Debtors' assets. *See id.*; 11 U.S.C. §§ 1141(d)(3); 727(a)(1). Here, as in New Towne, the release of nondebtor parties is especially unusual because it seeks to protect nondebtor parties even though the Debtors themselves are not entitled to a discharge. *See New Towne Dev.*, 410 B.R. at 230. As the *New Towne Dev.* court concluded:

> It would indeed be anomalous if the Bankruptcy Code prohibited a plan from discharging a liquidating nonindividual debtor that will not remain in business postconfirmation, but allowed that plan effectively to discharge non-debtor third parties by means of releases and permanent injunctions. The holding of Zale cannot be stretched to accommodate that outcome on this record.

*Id.* at 232.

33.     Under Fifth Circuit law, nondebtor releases do not violate the Bankruptcy Code only if they are (1) consensual, (2) specific in language, (3) a condition of settlement, and (4) and given for consideration.  *See*, *e.g.*, *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 776 (Bankr. N.D. tex. 2007), *aff'd*, 255 F. App'x. 909, 911-12 (5th Cir. 2007); *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987).  The Third Party Release does not satisfy any of these elements.

34.     The Debtors will argue that the opportunity for creditors to opt out of the Third Party Release automatically renders such releases consensual. In order to be consensual,

DOCS_NY:37487.4 15117/002

however, creditors who are provided the opportunity to opt out must receive the proper and adequate notice of such opportunity.  The Debtors failed to provide such notice because each of the Plan, Disclosure Statement and ballots confusingly described provide different requirements for creditors to opt out.

> 35.    The Disclosure Statement states:
>
> The Plan also provides that all holders of Claims that (i) vote to accept or are deemed to accept the Plan or (ii) are in a voting Class who abstain from voting on the Plan and do not opt out of the release provisions contained in Article VIII of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released …."

Disclosure Statement at Article III.M.  Thus, the Disclosure Statement says nothing about the consequences of rejecting the Plan with respect to the Third Party Release.

36.    The Plan states that "any holder of a Claim or Interest that opts out or otherwise objects to the releases" is not a Released Party or Releasing Party.  Plan at Article I.105; 106.  Article VIII of the Plan also does not mention the ability to opt out of the Third Party Release.  Thus, contrary to what the Disclosure Statement indicates the Plan provides, the Plan provides no information whatsoever about the mechanics of opting out of the Third Party Release.

37.    The Disclosure Statement Order provides that "[t]he Disclosure Statement (including all applicable exhibits thereto) provides holders of Claims, holders of Interests, and other parties in interest with sufficient notice of the injunction, exculpation and release provisions contained in Article VIII of the Plan, in satisfaction of the requirements of Bankruptcy Rule 3016(c)."  Disclosure Statement Order at ¶3.  It does not contain any provision regarding the opt out mechanics.

38.     Unlike the Plan, Disclosure Statement, and Disclosure Statement Order, the applicable ballots provide that abstaining from voting or rejecting the Plan without checking the opt out box constitutes deemed consent to the Third Party Release.  However, the ballots also direct creditors to the Plan, Disclosure Statement, and Disclosure Statement Order: "Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Class 5 Subsidiary GUC Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials)"; "You should review the Disclosure Statement and the Plan before you vote."  *See* Disclosure Statement Order at Schedule 3C (Form of Class 5 Ballot).

39.     In light of the varying, conflicting descriptions of what constitutes deemed consent to the Third Party Release, the notice provided to creditors with respect to the mechanics of opting out of the Third Party Release is inadequate insofar as they do not enable parties to understand what they are being asked to do and the options available to them.  Therefore, the failure to vote or check the opt out box does not constitute deemed consent here.  *Cf.* Plan Confirmation Hr'g Tr. at 44, 47, *In re Energy & Expl. Partners, Inc.*, Case No. 15-44931 (Bankr. N.D. Tex. Apr. 25, 2016 [Docket No. 730] ("[I]f . . . notice has gone out, parties have actually gotten it, they've had the opportunity to look it over, the disclosure is adequate so that they can actually understand what they're being asked to do and the options that they're being given . . . I would say that this is one of those situations where [Republic Supply] says those people can waive substantive rights by not affirmatively participating in the case.").  Any confusion created by the Debtors should be borne by them and the proposed Released Parties, not creditors.

40.     Further, any party who either abstained from voting or rejected the Plan without checking the opt out box with respect to the Third Party Release should not be deemed

15

to consent to the Third party Release if they are listed on the Schedule of Retained Causes of Action, which appears not to have been served on all of the listed parties.  Had creditors who are entitled to vote been provided with notice that they could be sued in the future, it may have induced them to vote to reject the Plan and/or opt out of the Third Party Release.  *See infra* at ¶53.

41.     Even if the Debtors can prove that the Third Party Release is consensual, the analysis does not end there.  The Debtors cannot establish the remaining elements to justify its approval.

42.     The evidence will show that no consideration was provided by any of the Released Parties and that the Third Party Release was not a condition to the settlements embodied in the Plan.

43.     The Third Party Release is further defective because it is not sufficiently specific.  The Fifth Circuit has a "specificity test" with respect to approval of releases.  *See Hernandez v. Larry Miller Roofing, Inc.*, 2016 U.S. App. LEXIS 204, at *15 (5th Cir. Jan. 5, 2016) (holding postconfirmation that release provisions in plan not specific enough to release a third party claim against a non-debtor).  For example, a party's status as an officer or director combined with boilerplate release language is not sufficiently specific.  *See id.* (citing *Applewood Chair Co. v. Three Rivers 150 Planning & Dev. Dist. (In re Applewood)*, 203 F.3d 914, 919 (5th Cir. 2000)).  Based on the foregoing, the Third Party Release does not adequately identify the Released Parties or the claims proposed to be released.

44.     In addition, the Third Party Release is impermissibly broad.  For example, it does not exclude claims relating to acts or omissions of Released parties that constitute gross negligence, fraud, willful misconduct or bad faith.

16

45.     Lastly, the existence of an indemnity obligation is not a sufficient basis for enjoining non-debtors' claims against third party corporate officers, directors and shareholders in connection with a liquidating plan.  *See New Towne Dev.*, 410 B.R. at 231.

### 4.     Claims Subject to the Pending Standing Motion Should not be Released

46.     The Proposed Complaint (as defined in the Standing Motion) asserts the following causes of action against certain of the Released Parties: (a) avoidance of the December 2016 Exchange; (b) avoidance of the January 2017 Exchange; (c) avoidance of the April 2017 Exchange; (d) avoidance of the May 2017 Exchange; (e) avoidance and recovery of interest payments made on account of the Second Lien Notes; (f) avoidance of the Make-Whole Obligations; (g) declaratory judgment that the Make-Whole Provisions are either unenforceable penalty provisions or unenforceable ipso facto clauses; (h) avoidance of unperfected liens with respect to the Unperfected GOM Leases; (i) declaratory judgment that 35% of the Debtors' interests in their foreign affiliates is unencumbered; (j) declaratory judgment that any commercial tort claims are unencumbered; (k) objection to the allowance of any claims while the avoidance actions are pending; (l) objection to the allowance of any portion of a claim that includes unmatured interest, including any Make-Whole amounts or original issue discount; (m) recharacterization of the payment of any fees, costs, and expenses to the professionals of the Second Lien Ad Hoc Group and Second Lien Indenture Trustee; and (n) declaratory judgment that any Make-Whole Amounts are an unreasonable charge under section 506(b) of the Bankruptcy Code.

47.     As set forth in the Standing Motion, the Committee believes the foregoing causes of action are colorable and meritorious.  Accordingly, the Plan cannot be confirmed to the extent such colorable causes of action are deemed released thereunder.

17

**B.**      **The Plan Fails the Best Interests of Creditors Test**

48.      The Plan will presumably be rejected by holders of general unsecured

claims, and cannot be confirmed over their objection because it violates the best interests test.

Section 1129(a)(7) of the Bankruptcy Code is often referred to as the "best interests of creditors

test."  Section 1129(a)(7) requires that, with respect to each impaired class of claims or interests,

(A) each holder of a claim or interest in such class (i) has accepted the plan, or (ii) will receive or

retain under the plan property of a value that is not less than the amount that holder would

receive or retain if the debtor liquidated under chapter 7.  11 U.S.C. §1129(a)(7).  The best

interests test is based on a hypothetical liquidation.  *See* 7 Collier on Bankruptcy ¶ 1129.03[7][b]

(15th rev. ed. 2009) ("This means that, absent consent, a creditor or interest holder must receive

property that has a present value equal to that participant's hypothetical chapter 7

distribution….").  Under a plan that proposes the release of claims, like this Plan, the released

claims must be considered when applying the best interest of creditors test under section

1129(a)(7).  *See In re Wash. Mut., Inc.*, 442 B.R. 314, 359-60 (Bankr. D. Del. 2011).

49.      Since holders of General Unsecured Claims in Class 5 and Class 6

currently stand to receive nothing on account of the released actions under the Plan and such

actions would be preserved in the context of a chapter 7 liquidation, these creditors will not

receive or retain under the Plan as much as they would in a hypothetical chapter 7 liquidation.

Even a peppercorn of value that would be available under chapter 7 but is not provided under a

plan suffices to violate the best interests of creditors test.  *See In re Affiliated Foods, Inc.*, 249

B.R. 770, 788 (Bankr. W.D. Mo. 2000) ("[T]he Plan does indeed appear to fail the best interests

test by $16,750.00. Considering the size of the estate and the projected surplus, this figure does

not seem significant. But, as counsel for [the claimant] accurately pointed out at the hearing, §

18

1129(a)( 7)(ii) is a bright line test and does not appear to provide for any de minimis exception.").

     50.    As set forth above, the Debtors propose to release valuable estate claims, including those asserted in the pending Derivative Actions notwithstanding the fact that settlements with certain insurers have already generated over $15 million in proceeds with respect to these and the securities class action claims against officers and directors.  As such, the Debtors cannot show that the Plan provides at least as much to creditors as they would receive if the Debtors were liquidated under chapter 7.  Accordingly, the Debtors have not established that the Plan satisfies section 1129(a)(7) of the Bankruptcy Code and confirmation must be denied.

**C.**    **The Plan Does Not Properly Retain Causes of Action**

     51.    The Plan fails to properly retain Causes of Action.  On March 21, 2018, the Debtors filed the *Notice of Filing of Plan Supplement* [Docket No. 612].  The Plan Supplement contains, among other things, a Schedule of Retained Causes of Action.  *See* Plan Supplement, Exh. C.  The Debtors have failed to meet the Fifth Circuit's stringent standard to retain causes of action for post-confirmation pursuit by the Plan Administrator.

     52.    To retain a cause of action under a chapter 11 plan, the plan must express a "specific and unequivocal" intent to retain the cause of action. *Dynasty Oil & Gas, LLC v. Citizens Bank* (*In re United Operating, LLC*), 540 F. 3d 351, 355 (5th Cir. 2008).  Blanket reservations of any and all claims do not satisfy this standard. *See id.* at 356.  On the contrary, the precise nature of the claims must be identified.  *See Rossco Holdings, Inc. v. McConnell*, 613 Fed. Appx. 302, 307 (5th Cir. 2015) ("a reservation of claims is effective if it identifies the nature of the claims reserved . . ."); *Wooley v. Haynes & Boone, L.L.P. (In re SI Restructuring Inc.)*, 714 F. 3d 860, 865 (5th Cir. 2013) (claims for fraud and breach of fiduciary duty were not preserved because neither the plan nor disclosure statement referenced any specific state law

19

claims); *Compton v. Anderson (In re MPF Holdings U.S. LLC)*, 701 F. 3d 449, 455 n. 4 (5th Cir.

2012) ("[The requirement] that the reorganization plan set forth the legal basis for the reserved

claims . . . was the core holding of *United Operating*.").

       53.    The purpose of this exacting standard is to "put [ ] creditors on notice of

any claim [the debtor] wishes to pursue after confirmation" and enable "creditors to determine

whether a proposed plan resolves matters satisfactorily before they vote to approve it." *In re*

*United Operating*, 540 F. 3d at 355. "[A]bsent specific and unequivocal retention language in the

plan, creditors lack sufficient information regarding their benefits and potential liabilities to cast

an intelligent vote." *Id.*

       54.    The Schedule of Retained Causes of Action states, in part, as follows:

8. Claims Related to Creditor Matrix Parties.

On January 4, 2018, the Debtors filed a list of creditors upon
whom the Notice of Chapter Bankruptcy Case was served, on a
consolidated basis for all of the Debtors [Docket No. 159] (the
"Creditor Matrix"). In addition to the following Exhibit C-1
through Exhibit C-3, to the extent not released pursuant to the
Plan, the Debtors or Plan Administrator, as applicable, expressly
retain all claims and Causes of Action against any Entity listed in
the Creditor Matrix, regardless of whether such Entity is set forth
in the following Exhibit C-1 through Exhibit C-3, to the extent
such Entity or Entities owe or may in the future owe money to the
Debtors or the Plan Administrator, as applicable.

In the event of any inconsistency between the releases of Entities
pursuant to the Plan or a Final Order and the attached Exhibit C-1
through Exhibit C-3, such releases granted pursuant to the Plan or
Final Order shall govern.

THE DEBTORS MAY AMEND, MODIFY, OR SUPPLEMENT
THIS EXHIBIT C AT ANY TIME BEFORE THE EFFECTIVE
DATE OF THE PLAN, OR ANY SUCH OTHER DATE AS
MAY BE PROVIDED FOR BY THE PLAN OR BY ORDER OF
THE BANKRUPTCY COURT.

Plan Supplement, Exh. C, at ¶8.

55. Exhibit C-1 lists one party and adequately specifies the nature of claims asserted against that party. Exhibit C-3 lists taxing authorities and specifies the nature of claims asserted against those parties. Exhibit C-3 is entitled "Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation and Possible Litigation." Unlike Exhibits C-1 and C-3, Exhibit C-2 lists 67 pages of parties and includes the same generic description of reserved claims against each party found in the title: "Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation and Possible Litigation." The Schedule of Retained Causes of Action provides that Exhibit C-2 "includes claims and Causes of Action the Debtors expressly retain based in whole or in part upon any and all contracts and leases to which any Debtor is a party or pursuant to which any Debtor or the Plan Administrator has any rights whatsoever, unless such Executory Contract or Unexpired Lease is assigned to a Purchaser pursuant to the Sale Transaction Documentation." Plan Supplement, Exh. C at ¶2. While it then goes on to list various grounds of claims, such list includes amorphous descriptions like "any business tort claims." *Id.*

56. The Schedule of Retained Causes of Action further provides that the Debtors reserve all causes of action "against any Entity listed on any of its Schedules, including schedule A/B, schedule D, schedule E, schedule F, schedule G, schedule H of each Debtor, as well as the statement of financial affairs of each Debtor, in each case to the extent such Entities owe or may in the future owe money to the Debtors or the Plan Administrator." *Id.* Notably, none of the Debtors' Schedules of Assets and Liabilities lists any pending litigation in which any of the Debtors are plaintiffs or any of the parties listed in Exhibit C-2 are defendants.

57. As of the date hereof no certificate of service of the Notice of Plan Supplement has been filed. Accordingly, it is unclear which creditors, if any, received notice

21

with respect to the Debtors' proposed retention of causes of action against them aside from those who receive electronic notice in these cases or by their own accord happened to review the docket *after* they received a solicitation package.

58.     The Schedule of Retained Causes of Action amounts to nothing more than a boilerplate, blanket reservation of claims. The number of words used and length of the reservation does not render it specific. Moreover, it appears that the Schedule of Retained Causes of Action was not served on all of the parties listed in it.  To the extent those parties are entitled to vote, they were not equipped with the necessary information to enable them to cast a reasonably informed vote.  For the foregoing reasons, the Debtors' proposed retention of causes of action fails to satisfy the Fifth Circuit's standard for approval.

**D.       The Plan Is Not Proposed in Good Faith**

59.     Good faith is to be determined by the totality of the circumstances.  *See In re Texas Extrusion Corp.*, 844 F.2d 1142, 1160 (5th Cir.), *cert. denied*, 488 U.S. 926 (1988); *Jasik v. Conrad (In re Jasik)*, 727 F.2d 1379, 1383 (5th Cir. 1984).  The Plan, which grants broad Debtor and third party releases  for no consideration, is not proposed in good faith under section 1129(a)(3) of the Bankruptcy Code.

**E.       The Debtors May not Be Able to Satisfy 1129(a) or (b) of the Bankruptcy Code**

60.     The impaired classes entitled to vote are Class 4 (Second Lien Notes Secured Claims), Class 5 (Subsidiary General Unsecured Claims) and Class 6 (Cobalt General Unsecured Claims).  The Class 4 (Second Lien Notes Secured Claims) are against all of the Debtors.  The Class 6 (Cobalt General Unsecured Claims) are against only the parent Cobalt International Energy, Inc. ("CIE"), not any of the Subsidiary Debtors.  In contrast, the Class 5 (Subsidiary General Unsecured Claims) are against the Subsidiary Debtors, not the parent CIE.

22

61.     As set forth above, the Committee deposed Mr. Keglevic, one of the

Debtors' disinterested directors, on March 27, 2018. 

Based on the foregoing testimony, the Committee believes that Class 4

(Second Lien Notes Secured Claims) cannot be counted as an impaired accepting class.  In the

event that Class 5 (Subsidiary General Unsecured Claims) and Class 6 (Cobalt General

Unsecured Claims) vote to reject the Plan the Debtors will not have the requisite impaired

accepting class and be unable to satisfy sections 1129(a)(8) or 1129(a)(10).  Accordingly, the

Debtors would be unable to confirm the Plan as a matter of law under either section 1129(a) or

(b).

63.     Unless the Plan is accepted by both Class 5 and Class 6, if the Class 4

votes are not counted, the Debtors will be unable to confirm the Plan under section 1129(b) of

23

the Bankruptcy Code.  While the Plan is a joint plan, it does not provide for substantive

consolidation of the Debtors.  Accordingly, confirmation requirements must be satisfied per

Debtor, which means that multiple debtors with a joint plan may not cram their plan down on all

creditors based on a single impaired accepting class where the impaired accepting class has

claims against different debtors than the class that is crammed down.  *See, e.g., In re Tribune*

*Co.,* 464 B.R. 126, 1820183 (Bankr. D. Del. 2011); *cf. In re ADPT DFN Holdings, LLC,* 574

B.R. 87, 107 (N.D. Tex. 2017) (concluding that tabulation of votes on per plan was appropriate

after approving substantive consolidation but making "no comment on whether it would have

been proper in the absence of substantive consolidation"); *JPMCC 2007-C1 Grasslawn Lodging,*

*LLC v. Transwest Resort Props. (In re Transwest Resort Props.),* 881 F.3d 724 (9th Cir. 2018).

   64. As set forth above, the voting deadline was March 28, 2018 and the voting

report is not due until April 2, 2018, the day before the confirmation hearing.  Accordingly, as of

the filing of this Objection, it is unclear whether the Plan was accepted or rejected by any of

these classes or if the Debtors will be seeking confirmation of the Plan under section 1129(b) of

the Bankruptcy Code.  The Committee reserves all of its rights with respect to the foregoing

issues.

**F.** **The Plan and Confirmation Order Must Preserve the Right**
   **of the Committee and/or Plan Administrator to Object to Intercompany Claims**

   65. Although the Committee firmly believes that the Plan cannot be

confirmed, if the Court is inclined to disagree, the Plan and confirmation order must, at a

minimum, preserve the rights of the Plan Administrator and/or parties in interest to pursue the

recharacterization and disallowance of the Intercompany Claims, including, without limitation,

the Committee Intercompany Payable Objection. These claims have been scheduled as

contingent, unliquidated and disputed and the holders of such claims are not required to file

24

proofs of claim pursuant to the approved bar date procedures.  Any attempt by the Debtors to seek to allow such Claims via the Plan or without adequate notice, discovery or hearing should be denied.

**G.     Committee Support for the Ad Hoc Committee's Investigation of Collusion in the Sale Process**

66.     With respect to the *Objection of Ad Hoc Committee of Unsecured Noteholders to the Debtors' Fourth Amended Joint Chapter 11 Plan* (the "Ad Hoc Committee Objection"), the Committee supports the Ad Hoc Committee of Unsecured Noteholders' continuing efforts to seek discovery to determine whether the auction of the Debtors' assets was tainted by collusion among the joint bidders who submitted the winning bid at the auction of the North Platte assets.  The Committee would view proof of actionable collusion as a basis for denying confirmation of the Plan for the reasons set for the in the Ad Hoc Committee Objection to the extent the Plan proposes to consummate a sale for less than the fair market value of the subject assets due to improper conduct by the joint venture bidders.

## IV.     RESERVATION OF RIGHTS

67.     The Committee is conducting ongoing discovery with respect to confirmation of the Plan and reserves all rights to supplement this Objection at or prior to the hearing.

## V.     CONCLUSION

68.     Based on the foregoing, the Committee respectfully requests that this Court deny approval of the Plan and grant such other and further relief as this Court deems appropriate.

DOCS_NY:37487.4 15117/002

Dated:   March 29, 2018

*Kenneth Green*
_____
SNOW SPENCE GREEN, LLP
Kenneth Green, Esq. (TX Bar No. 24036677)
2929 Allen Parkway, Suite 2800
Houston, TX 77019
Telephone: (713) 335-4830
Email:  kgreen@snowspencelaw.com

*Local Counsel for the Official Committee of Unsecured Creditors*


PACHULSKI STANG ZIEHL & JONES LLP

Robert J. Feinstein, Esq. (admitted *pro hac vice*)
780 Third Ave., 34th Fl.
New York, NY  10017
Telephone:  (212) 561-7700
Email:  rfeinstein@pszjlaw.com
            sgolden@pszjlaw.com

Ira Kharasch, Esq. (admitted *pro hac vice*)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067-4100
Telephone:  (310) 277-6910
Email:  ikharasch@pszjlaw.coom

*Lead Counsel for the Official Committee of Unsecured Creditors*

DOCS_NY:37487.4 15117/002